IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON A 2012 SILVER MERCEDES, ML350, VIN 4JGDA5HB8CA023621, NH REG 4648283 | Case No. 20-mj-49-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Benjamin Slocum, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since June 2007. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as a Special Agent, I investigate criminal violations relating to a broad range of immigration and customs-related statutes and have been cross-designated to investigate violations relating to the distribution of illicit narcotics as specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. Through my training, education, and experience, I have become familiar generally with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of

search warrants, the use of tracking devices, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in or on the following vehicle: a 2012 Silver Mercedes with vehicle identification number 3621, New Hampshire registration 8283, registered to Ryan DEAN, Hinsdale, New Hampshire (the "Subject Vehicle"). Based on the facts set forth in this affidavit, I believe that the Subject Vehicle is being used by DEAN in furtherance of violating Title 21, United States Code, Sections 841(a)(1)(distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) and that there is probable cause to believe that the installation of a tracking device in or on the Subject Vehicle and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3. Based upon my training, experience, and involvement in prior investigations, I know that individuals who distribute drugs often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to prospective purchasers. They also use motor vehicles to transport drug proceeds to and/or from their illicit transactions, as well as to and/or from locations where these proceeds may be counted and stored. Because individuals who are involved in the distribution of controlled substances are highly cognizant of the presence of law enforcement, and often engage in counter-surveillance maneuvers while traveling in a motor vehicle, it is frequently difficult for

law enforcement officers to effectively conduct surveillance. The presence of a tracking device on a motor vehicle which is being utilized for the distribution of controlled substances or the transportation of drug proceeds is beneficial because it allows law enforcement officers to track the movement of the vehicle effectively and to decrease the chance of detection.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators of witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through these conversations and my own analysis of these reports, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of an order authorizing the government, at any hour of the day or night, to install, monitor, maintain, and remove a mobile tracking device which transmits an electronic signal that can be used to detect the movement and location of the above described Subject Vehicle, and make surreptitious entry into the vehicle at any hour of the day or night to install the mobile tracking device, maintain the mobile tracking device, or remove the mobile tracking device. This affidavit does not set forth all of my knowledge about this investigation.

## **PROBABLE CAUSE**

5.  On or about October 10th, 2019, I learned from a Keene Police Department (KPD) reliable confidential informant ("CI") that Ryan DEAN is involved in the distribution of narcotics in violation of 21 USC § 841 in the greater Keene, New Hampshire area. The CI originally began cooperating with the KPD for consideration on pending criminal charges. The CI subsequently informed law enforcement that DEAN regularly receives large shipments of

marijuana from California and New York. DEAN generally will only sell marijuana to customers by the pound. DEAN charges anywhere from $1,800 to $2,200 per pound. On several occasions, the CI has seen DEAN in possession of several pounds of marijuana while in the Subject Vehicle.

6. On or about October 28, 2019, at the direction of law enforcement, the CI contacted DEAN to arrange a small purchase of $200 of marijuana. During this meeting, the CI was joined by a New Hampshire State Police Trooper (UCA) acting in an Under-Cover capacity. The purpose of this meeting was to have the CI introduce the UCA as a potential future buyer from DEAN. The UCA did not have direct contact with DEAN during this meeting, but DEAN witnessed the UCA hand the CI the $200 of buy money for the purchase of the marijuana.

7. On or about November 12, 2019, at the direction of law enforcement, the CI made contact with DEAN and arranged to make another purchase of $800 of marijuana. The CI was again joined by the UCA. During this meeting, the UCA met with the CI and DEAN in a vehicle owned by DEAN.

8. Once in the vehicle, DEAN handed the UCA a plastic bag that contained what appeared to be marijuana. The UCA then discussed the price with DEAN and confirmed $800 was acceptable. During the meeting, DEAN supplied the UCA with a cellular number 8730) and stated that the UCA could call him directly if he wanted to make future purchases. DEAN told the UCA that he was buying "Top Tier" quality marijuana.

9. During the meeting, DEAN made statements that he was also selling to several other subjects in the area. DEAN stated that he was selling about 10 pounds to one subject named "KENNETH" for the last two years. DEAN would drop off the 10 pounds to "KENNETH" and then come back in a week and "KENNETH" would supply him with payment.

4

10. DEAN and the UCA further discussed where the UCA was purchasing his marijuana from and prices that he was paying. DEAN stated to the UCA that he gets his marijuana from Massachusetts, California, New York, and Maine and guaranteed that he could "under cut" the price of anyone around. DEAN stated that he was able to do this because he buys directly from the growers and people who have warehouses in Maine.

11. DEAN stated further stated that his source of supply in California will fill a storage unit up in the Northeast with marijuana and call him with the location and mail him a key so that he can take whatever amount he wishes. DEAN stated that on some of the larger cash amount deals he will send bulk cash payments back to his source of supply through the mail.

12. The UCA stated that he was making these purchases for his boss, since his boss was looking for a better source of supply. DEAN asked the UCA if his boss wanted to purchase as much as 10-20 "P's" (commonly used drug slang for pound quantity). DEAN stated that he could deliver that much on a regular basis with no problem.

13. DEAN further stated during this meeting that he also makes "Dabs." From my training and experience, I know that "Dabs" or "dabbing" are names for the use of concentrated butane hash oil (or BHO), which is a relatively new method of administering/ingesting cannabis that involves the inhalation of highly concentrated tetrahydrocannabinol (THC), the main active chemical in cannabis. DEAN then showed the UCA a video of his cooking operation in his backyard of him making "Dabs." DEAN indicated that for every pound of marijuana he cooks, he gets 2.5 ounces of "Dab."

14. On November 26, 2019, the UCA made contact with DEAN to purchase $800 worth of marijuana. During this meeting, DEAN arrived in a 1992 Mitsubishi that is registered to DEAN. The UCA got into the front seat of the vehicle, at which time DEAN handed him two vacuum-sealed bags of marijuana. DEAN stated that he brought two different kinds of

5

marijuana and described them as "Girl Scout Cookies" and "Liquorice Haze". The UCA handed DEAN the $800 and DEAN added the money to a larger wad of money that he removed from the inside of his jacket. The UCA stated that he would not be offended if DEAN counted the money. DEAN's response was that he has "a machine" at home. The UCA believed DEAN was referring to a money counter.

15.     On December 11, 2019, the UCA contacted DEAN and arranged a purchase of $550 worth of "Dab". DEAN arrived at the meeting in a 2006 Hummer that is registered to DEAN. The UCA got into the front seat of the Hummer where subsequently DEAN handed the UCA a plastic bag that contained approximately 28 individual plastic containers that contained marijuana extract (shatter/dabs). The UCA confirmed the price of $550 and then handed DEAN the currency.

16.     During this meeting, DEAN again discussed how he manufactured the "Dabs" and "Shatter". DEAN described "Shatter" as basically pure THC (tetrahydracannabinol, the principal psychoactive ingredient in marijuana). DEAN explained that he sells it faster than he can make it. Once he has a batch made, he posts it online and sells out immediately.

17.     During this same meeting, DEAN discussed just having to deposit $70,000 into the bank. The UCA asked how he does this without filling out paperwork or making the bank suspicious. DEAN stated that he meets with the bank manager and files some paperwork. DEAN stated that he utilizes two business accounts to "funnel" his money through.

18.     The UCA and DEAN further discussed the possibility of purchasing "heavier" things (this is in reference to purchasing harder narcotics such as cocaine, heroin, and fentanyl). DEAN stated that he has connections in New York and Connecticut for that stuff. DEAN stated that he only deals in the "heavier" stuff if it is in larger amounts. DEAN went on to say there

was a "semi-truck load" in Tennessee full of marijuana waiting to be offloaded. DEAN stated that he didn't want to drive that far, though.

19. DEAN further stated that if the UCA's boss was serious about making larger purchases, he would charge $1,800 per pound. DEAN stated that he has done $150,000 deals with suppliers in Maine. DEAN stated that he does not bring money to larger deals like this. He stated that he will send the money in the mail.

20. During the same meeting, DEAN and the UCA discussed transport methods and DEAN indicated he liked to use the Hummer because he could fit a lot in it. DEAN went on to say he went and got "a hundred pounds" the other day from New York. Based on previous conversations, the UCA believed DEAN was referring to 100 pounds of marijuana. DEAN advised the UCA that he met a semi-truck on the side of the road. He said inside the semi-truck were huge boxes of marijuana. DEAN said the boxes wouldn't fit in his Hummer, so he had to go to Wal-Mart to buy large duffle bags to put the marijuana in. DEAN estimated he made $22,000 (twenty-two thousand dollars) from that deal.

21. According to a New Hampshire driver's license check, DEAN resides at                    Hinsdale, New Hampshire. Before the undercover meeting with DEAN on November 12, 2019, agents established surveillance in the area of                    Hinsdale, New Hampshire. Law enforcement observed DEAN leave his residence in the Hummer. A short time later, DEAN arrived at the meeting location and conducted the narcotic transaction with the UCA. A short time later, law enforcement observed DEAN arrive back at                    in the Hummer.

22. On January 7, 2020, the UCA contacted DEAN and arranged to make a purchase of 1 pound of marijuana from DEAN for $1,000. DEAN arrived at the meet location in the Subject Vehicle. The UCA got into the front seat of the Subject Vehicle where DEAN

7

subsequently handed the UCA 1 pound of suspected marijuana in a vacuum-sealed bag and $300 worth of "Dabs".  The UCA then paid DEAN $1,300 for the marijuana and the "Dabs".

23.     While in the Subject Vehicle, DEAN discussed with the UCA about having to go to Portland, Maine if the UCA wanted to purchase higher quality marijuana.  During this conversation, DEAN showed the UCA some photographs on his cellular phone of different kinds of marijuana he had available and their prices.  DEAN came across a photograph that depicted what the UCA believed to be bulk currency.  DEAN stated that "Those are all ten thousand stacks right there."

24.     On January 21, 2020, the UCA contacted DEAN and arranged to make a purchase of 1 pound of marijuana from DEAN for $1,000.  Before the predetermined meet time, Customs and Border Protections (CBP AIR) established surveillance over the residence of DEAN located at                               Hinsdale, New Hampshire.  CBP AIR observed the Subject Vehicle parked at the residence.

25.     Just before the agreed upon meeting time, CBP AIR observed a male exit the residence, get into the Subject Vehicle, and leave the residence.  CBP AIR maintained visual contact with the Subject Vehicle until it arrived at the meeting location.  Once at the meeting location, DEAN exited the Subject Vehicle carrying a cardboard box and get into the rear passenger seat of the UCA's vehicle.

26.     While in the UCA's vehicle, DEAN handed the UCA the cardboard box that contained what appeared to be 1 pound of marijuana in a vacuum-sealed bag.  The UCA handed DEAN the $1,000 of serialized U.S. currency.  During the meeting, the UCA asked DEAN why he was not driving his Hummer.  DEAN stated that he was going to be doing some vehicle modifications and is now using the Subject Vehicle.

27. At the conclusion of the meeting, DEAN exited the UCA's vehicle and got back into the Subject Vehicle. Upon DEAN exiting the parking lot of the meet location, CBP AIR observed DEAN drive directly back to his residence, exit the Subject Vehicle and go into his residence.

28. On January 28, 2020, the UCA contacted DEAN and arranged to make a purchase of 1 pound of marijuana from DEAN for $2,000. DEAN and the UCA agreed upon a meet location and time. Prior to the meeting, the UCA sent DEAN a text requesting DEAN supply his banking information so that the UCA could wire the $2,000 payment. Via text message, DEAN supplied the UCA with the requested information.

29. Before the meeting, agents established surveillance in the area of the meet location. A short time later, DEAN arrived in the Subject Vehicle.

30. The UCA exited their vehicle and got into the Subject Vehicle. Once in the Subject Vehicle, DEAN handed the UCA 1 pound of suspected marijuana concealed in a plastic shopping bag. Once the UCA confirmed the 1 pound of marijuana, the UCA placed a cellular phone call to an HSI UCA confirming the transaction was correct. The HSI UCA then wired the $2,000 into DEAN's bank account.

31. Once DEAN was able to verify the funds were received into his account, the UCA exited the Subject Vehicle and left the area. DEAN remained in the Subject Vehicle for several minutes until he exited the parking lot. Law enforcement conducted surveillance on the Subject Vehicle until it parked in front of a Super Cuts and DEAN exited the Subject Vehicle and went into the business.

## AUTHORIZATION REQUEST

32. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that

authorizes members of the HSI, the KPD, or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the Subject Vehicle within the District of New Hampshire within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the Subject Vehicle after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and, if necessary, to surreptitiously enter the resident parking areas of the locations specified herein to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of New Hampshire.

33. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

/s/ Benjamin Slocum
Special Agent Benjamin Slocum
Homeland Security Investigations

SUBSCRIBED AND SWORN TO BEFORE ME this the 11th day of February, 2020.

Hon. Andrea Johnstone
United States Magistrate Judge

11